(EMB-7337)
ERIC M. BERNSTEIN & ASSOCIATES, L.L.C.
Two North Road
P.O. Box 4922
Warren, NJ 07059
(732) 805-3360  (732) 805-3346 fax
Attorneys for Plaintiff
Our File No. 1967-001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON DIVISION

| | | |
|---|---|---|
| INTERACTIVE MEDIA ENTERTAINMENT AND GAMING ASSOCIATION, L.L.C., a limited liability corporation of the State of New Jersey, | : | CIVIL ACTION |
| | : | |
| | | Case Number 07-2625 (MLC) |
| | : | |
| *Plaintiff,* | : | |
| -vs- | : | |
| ALBERTO GONZALES, Attorney General of the United States, THE FEDERAL TRADE COMMISSION and THE FEDERAL RESERVE SYSTEM, | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

## PLAINTIFF'S BRIEF IN SUPPORT OF
## ISSUANCE OF TEMPORARY RESTRAINING ORDER

Eric M. Bernstein & Associates, L.L.C.
Attorneys for Plaintiff

Eric Martin Bernstein, Esquire
Of Counsel and On the Brief

Philip G. George, Esquire
On the Brief

# TABLE OF CONTENTS

1. Table of Citations                                                                    2

2. Preliminary Statement                                                                 5

3. Statement of Facts                                                                    6

4. Procedural History                                                                   17

5. Legal Argument

    Point One - The Standard of Review                                          19

    Point Two - The UIGEA Unconstitutionally Restricts Gambling
    On the Internet as a Form of Consensual Private Conduct,
    Which is Legal in New Jersey and Other States.                              23

    Point Three - By Criminalizing Any Financial Transaction Relating
    to Internet Gambling, The Act's Selective Prohibitions Do Not
    Constitute the Least Restrictive Means to Regulate Private Consensual
    Conduct On the Internet.                                                     30

    Point Four - The UIGEA's Inconsistent Regulation of Internet
    Gambling And Its Inconsistent Effect Across the States and
    Internationally Renders the UIGEA Unconstitutional.                         35

6. Conclusions                                                                          42

1

# TABLE OF CITATIONS

## Federal Statutes

18 *U.S.C.* §1304                                              38

19 *U.S.C.* § 2504(A)                                          40

19 *U.S.C.* § 3512(a)                                          40

31 *U.S.C.* § 5361, *et seq.*                                  12

47 *U.S.C.* § 231, *et seq.*                                   30

## Federal Regulations

31 *C.F.R.* § 103.18-21                                        36

## Federal Cases

*Rhode Island Liquor Stores Assn. v. Evening Call Pub. Co.,* 517 *U.S.*
484, 116 *S.Ct.* 1495 (2006)                                   39

*Ashcroft v. American Civil Liberties Union,* 542 *U.S.* 656,
      124 *S.Ct.* 2783 (2004)                                  4, 20, 22, 30-32

*Lawrence v. Texas,* 539 *U.S.* 558, 123 *S.Ct.* 2472 (2003)   4, 23, 26-27, 35

*Boy Scouts of America v. Dale,* 530 *U.S.* 640, 120 *S.Ct.* 2446 (2000)   20, 33-36

*Sable Communications of California, Inc., v. FCC,* 492 *U.S.* 115 (1989)   27, 33

*Virginia v. Am. Booksellers Ass'n, Inc.,* 484 *U.S.* 383, 392-93 (1988)   21

*Babbitt v. United Farm Workers Nat. Union,* 442 *U.S.* 289 (1979)   21

*Hunt v. Washington State Apple Adver. Comm'n,* 432 *U.S.* 333 (1977)   21

*Elrod v. Burns,* 427 *U.S.* 347 (1976)                        20

*Doran v. Salem Inn, Inc.,* 422 *U.S.* 922, 95 *S.Ct.* 2561 (1975)   19

*Murray v. Schooner Charming Betsy,* 6 *U.S.* (2 Cranch) 64, 2 *L.Ed.* 208
(1804)                                                         41

*New Hampshire Motor Transport Ass'n v. Rowe,* 448 *F.3d* 66
(First Cir. 2006)                                              37

*Corus Staal BV v. Department of Commerce, et al.,* 395 *F.3d* 1343
(Fed. Cir. 2005)                                                          41

*Khodara Environmental, Inc. v. Blakey*, 376 *F.3d* 187 (3d Cir. 2004)          22

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 *F.3d* 700 (3rd Cir. 2004)      19

*In Re MasterCard Litigation,* 313 *F.3d* 257 (Fifth Cir. 2002)          8, 29, 32

*Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 *F.3d* 144 (3d Cir.2002)        19

*Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 *F.3d* 435
(3d Cir.2000)                                                             20

*St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin
Islands*, 218 *F.3d* 232 (3d Cir. 2000)                                   21

*Allegheny Energy, Inc. v. DQE, Inc.*, 171 *F.3d* 153 (3rd Cir. 1999)          19

*Greater New Orleans Broadcasting Ass'n v. U.S.* 149 F.3d 334
(5th Cir. 1998)                                                           38

*Pappan Enter., Inc. v. Hardee's Food Sys., Inc.*, 143 *F.3d* 800
(3d Cir. 1998)                                                            20

*Valley Broadcasting Co. v. U.S.*, 107 *F.3d* 1328 (9th Cir. 1997)             38

*Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 *F. 2d*
660 (Fed Cir. 1992)                                                       41

*Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 *F.2d* 643
(3d Cir. 1990)                                                            20

*Opticians Association of America v. Independent Opticians of America,*
920 *F.2d* 187 (3d Cir. 1990).                                            20

*U.S. v. Extreme Associates, Inc.,* 352 *F.Supp. 2d* 578 (W.D. Pa. 2005)        6

*Slater Steels Corp, et al., v. United States, et al.,* 297 *F. Supp. 2d* 1351
(Ct. Int. Trade)                                                         41

*Thompson v. Handa-Lopez, Inc.*, 998 *F.Supp.* 738 (W.D. Texas 1998)           29

## Unreported Federal Cases

*American Civil Liberties Union v. Gonzales,* 2006 WL 2927284

(E.D. Pa. 2006)                                                                     21

*Ass'n of Charitable Games of Mo. v. Missouri Gaming Com'n,*
WL 602050 (W.D. Mo. 1998)                                                           28

## State Statutes

Alabama § 13A-12-20(8)                                                              36

Alaska § 11.66.280(6)                                                               36

Missouri § 572.010-8                                                                36

Hawaii §712-1231                                                                    36

*N.J.S.A. 10:5-2, et seq.*                                                          33

*N.J.S.A.* 2C:37-1(c)                                                               35

## State Administrative Codes

*N.J.A.C.* 19:45-1.24A                                                              36

## Other Sources

*Congressional Record*, 109th Congress Debate on H.R. 4411,
July 13, 2006 at Govtrac.com                                                        24-25

07-209 U Part 1WT/DS285/RW *United States - Measures Affecting
the Cross-border Supply of Gambling and Betting Services* - Recourse to
Article 21.5 of the DSU by Antigua and Barbuda - Report of the Panel
dated March 30, 2007, paragraphs 6.109 to 6.135.                                    12, 37

Klee, Elizabeth, *Families' Use of Payment Instruments During a
Decade of Change in the U.S. Payment System,* Board of
Governors of the Federal Reserve System, February 16, 2006                          10

Methenitis, Mark, *Internet Gambling Regulation Present and
Future: Technology Outpaces Legislation as the MMORPG
Problem Emerges,* ___ Texas Tech University School of Law ___,
December 2005                                                                       18, 29

Liddell, Jr., Pearson, *et al., Internet Gambling: On a Roll?*
28 *Seton Hall Legislative Journal* 315, 316-323 (2004)                             9, 29

Schwartz, Joel Michael, *The Internet Gambling Fallacy Craps Out,*

14 *Berkeley Technology Law Journal* 1021 (1999)                    26, 29

*WTO Legal Texts- A Summary of the Final Act of the*
*Uruguay Round, at*  http://www.gatt.org/homewto.html            10

*See* Lessani, Andrea M., *How Much Do You Want to Bet That the*
*Internet Gambling Prohibition Act of 1997 Is Not the Most Effective*
*Way to Tackle the Problems of Online Gambling?*
The UCLA Online Institute for Cyberspace Law and Policy, May 1998    29

Comment of Senator Jon Kyl on passage of Unlawful Internet
Gambling Enforcement Act, Congressional Record, Senate,
Page S11045-S11046, Nov. 16, 2006                                29

## PRELIMINARY STATEMENT

In October 2006, Congress passed the "The Unlawful Internet Gambling Enforcement Act of 2006," codified as 31 *U.S.C.* § 5361, *et seq.* (hereinafter referred to as the "UIGEA" or the "Act"). Plaintiff submits that the UIGEA must be restrained and enjoined from enforcement. First, Plaintiff has standing to challenge the UIGEA because of its immediate, documented affect on entities and persons situated as iMEGA's members. iMEGA will show that it satisfies the criteria for issuance of a temporary restraining order because: (1) there is a substantial likelihood that iMEGA will prevail on the merits; (2) clearly, iMEGA's members and those whose interests are represented will suffer irreparable injury unless the injunction issues; (3) the threatened injury to First Amendment protected rights outweighs the lack of damage if the UIGEA is not restrained; and, (4) the injunction, if issued, is not adverse to the public interest.

Under the Supreme Court's precedents in *Ashcroft v. American Civil Liberties Union*, 542 *U.S.* 656, 124 *S.Ct.* 2783 (2004) and *Lawrence v. Texas,* 539 *U.S.* 558, 123 *S.Ct.* 2472 (2003), the act of gambling in private on the Internet is protected by First Amendment privacy concerns. Further, filtering technology is recognized by the

Supreme Court, led by the Third Circuit's integration of tradition and technology in the *COPA* litigation, as a less restrictive means to regulate protected conduct. State laws in at least the states of Missouri, Alaska, Alabama and New Jersey do not specifically criminalize the act of a private person betting with or for private winnings. Thus, the individual's right to access iMEGA's represented interests is a constitutionally protected activity which cannot be infringed by the UIGEA.

Finally, there is precedent under *In Re MasterCard Litigation,* 313 *F.3d* 257 (Fifth Cir. 2002), holding that transmittal of Internet gambling funds through the use of internet payment system instruments is not an illegal act. Further, the UIGEA itself is so inconsistent in striking across individual state regulation, sovereign Tribal licensing and sovereign international control of Internet gambling is as to make the UIGEA violative of First Amendment rights. This inconsistency is nowhere more apparent than New Jersey, which permits the transfer of funds by payment system instrument by computer for the purpose of gambling, without reference to the location of the bet or wager.

### STATEMENT OF FACTS

Plaintiff, Interactive Media Entertainment & Gaming Association, L.L.C. (hereinafter referred to as "iMEGA"), is a not-for-profit corporation duly formed and constituted under the laws of the State of New Jersey. iMEGA was formed to represent the interests of its members, who are businesses or individuals involved in Internet interactive media, entertainment and gaming, including Internet gambling. iMEGA does not itself participate in any electronic gaming on the Internet, but it does engage in the collection and dissemination of information and advice regarding such services to its members and members of the general public in various media, including speech, print

and Internet media. Some of its members are individuals or business entities engaged in the business of providing interactive entertainment services to individuals through use of personal computers, both with and without a fee.

Some iMEGA members offer Internet gambling which is available to private individuals anywhere in the world as a form of entertainment which can be engaged in by persons within the privacy of their homes or other places using private personal computers.

The advent of computer technology and the connectivity of computers gave rise in the last quarter century or more to the ability to communicate and interact among individuals and business entities, among others, by use of a computer network known as the Internet. Today, information exchange and the possibilities created by this availability, through personal computers and electronics, and linked together by the Internet, permeate society. An apt description was recently stipulated in the Third Circuit, as described by the United States District Court in *U.S. v. Extreme Associates, Inc.*, 352 *F.Supp. 2d* 578, 580-581 (W.D. Pa. 2005):

> "The Internet is a decentralized, global medium of communication that links people, institutions, corporations, and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers. Although precise estimates are difficult to formulate due to its constant and rapid growth, the Internet is currently believed to connect more than 159 countries and close to 322 million users worldwide. Because the Internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls all of the material made available on the Internet or otherwise limits the ability of others to access such materials. The range of digital information available to Internet users-which includes text, images, sound and video-is individually created, maintained, controlled, and located on millions of separate individual computers around the world. Each content provider of a web site is responsible for its content. *Id.* at 580.

"The Internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it. The Internet provides an affordable means for communicating with, accessing, and posting content to a worldwide audience. In the United States, individuals have several easy means of gaining access to computer communications systems in general and to the Internet in particular. Many educational institutions, businesses, local communities, and libraries maintain an easily accessible computer network which is linked directly to the Internet. Many of these entities restrict access to sexually explicit material. *Id.*
. . . . Any Internet user anywhere in the world with the proper software can view web pages posted by others, read text, view images and video, and listen to sounds posted at these web sites. Internet users wishing to make content available to others must create the content and publish it on the Internet through an ISP." *Id.* at 580-581.

Within that technological context, the Internet gave rise to unlimited possibilities in information, information processing and dissemination, and entertainment. Among those possibilities was the ability of individuals and businesses to design systems which permit participation in games of chance or skill as a form of entertainment. Those persons can win or lose; they can even bet or wager if they wish. Starting in about 1995, and prior to October 2006, some of iMEGA's members engaged in the business of operating "Internet Casino websites." An Internet Casino website is actually a computer image generated and supported by computer technology and accessible to anyone, with a personal computer and access to the Internet through dial-up, broadband, wireless or dedicated access, who wants to engage in games of chance or skill. In *In Re MasterCard Litigation,* 313 *F.3d* 257 (Fifth Cir. 2002), the court succinctly described how these Internet Casino websites, including those operated by iMEGA members, generally function.

First, a gambler directs the browser, or search device, of his computer to an Online casino website. The gambler is advised that he will receive a gambling credit or "chip" for each dollar that he deposits and is instructed to enter his billing information. The gambler can use a credit card, a debit card drawing funds on his account, telephone, wire transfer, money order and/or personal check or

8

other transaction to purchase a gambling credit. The gambler can then place wagers with any of the games located on the site, which are computer generated and administered. Any winnings are separately transferred to the gambler's account and any losses are debited against the account. In the case of credit cards, the issuing institution debits losses against the account of the cardholder. *Id.* at 260.

Persons wishing to engage in games of chance and/or skill and betting or wagering on them through iMEGA members' Internet Casino websites may originate such an activity while located anywhere in the world, including any jurisdiction of the United States. Some of iMEGA's members and the interests of the some of the industries which it represents, through the facilities of the Internet, reach an audience for the supplying of entertainment through wagering and betting which potentially encompasses all of the states of the United States and most foreign countries. *See* Liddell, Jr., Pearson, *et al., Internet Gambling: On a Roll?* 28 *Seton Hall Legislative Journal* 315, 316-323 (2004). iMEGA members advertise their activities in various media, including but not limited to magazines, periodicals, and on the Internet. Advertising is a necessary incident to such commercial operations. iMEGA members correctly and accurately represent that they operate legally in the country wherein they are incorporated and where their servers are located.

Persons wishing to engage in games of chance or skill and betting or wagering on them through some of iMEGA members' casino websites prior to October 2006 were able to do so by transmitting funds belonging to them by wire transfer, debit card, credit card, by mail or by other means to the said Internet Casino website websites of iMEGA members. Such transactions, of necessity, involve transfer of funds from the gambler through financial institutions including banks, clearing houses and the Defendant Federal Reserve System itself. Transactions are processed through financial instruments known

9

as "payment system instruments." A payment system instrument can consist of checks, wire transfers, debit card or direct debit transactions, electronic transfer, or credit card transactions. Klee, Elizabeth, *Families' Use of Payment Instruments During a Decade of Change in the U.S. Payment System,* Board of Governors of the Federal Reserve System, February 16, 2006, 3-4. The actual transfers of funds through payment system instruments does not involve the wagering or betting of any thing of value and does not involve, implicate or rely in any way upon any luck in order to accomplish the transaction which is requested by the bettor and accepted by the Internet Casino. However, these financial institutions may assess a small set fee for the use of their services which is not tied to or dependent upon the placing, winning or losing of a bet or wager in any way.

While the Internet was growing in importance and during the time that iMEGA's members were designing, building and implementing the Internet Casino website industry, many nations were designing, building and implementing an international system to liberalize trade and lower protective tariffs internationally. Prior to 1994, these nations had entered into a treaty known as the "GATT" or "General Agreement on Tariffs and Trade," which has been superseded as an international treaty organization by the World Trade Organization. The United States became a signatory to the GATT in 1948. *See* www.wto.org/english/thewto_e/glossary_e/glossary_e.htm. Discussions began at Punta del Este, Uruguay, in September 1986 for a revision to the GATT, and culminated in the final adoption of the "Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations," commonly called the "Uruguay Rounds," in April 1994. *WTO Legal Texts- A Summary of the Final Act of the Uruguay Round, at* http://www.gatt.org/homewto.html. The United States ratified and agreed to abide by the

Accords of the Treaty.  The WTO contains dispute resolution procedures to resolve controversies between signatories as to its terms.  *Final Act of 1986-1994 Uruguay Rounds, Annex 2, Understanding on Rules and Procedures Governing the Settlement of Disputes.*

The sovereign nation of Antigua and Barbuda, which became a signatory to the GATT in 1987, is one of several home countries which have seen a dramatic rise in the formation and headquartering of Internet Casino websites. Antigua and Barbuda initiated grievance procedures, known as *Dispute DS285 United States — Measures Affecting the Cross-Border Supply of Gambling and Betting Services* against the United States in 2003 because of the United States government's increasing interference with its nationals and resident corporations who are or who have engaged in the business of operating Internet Casino websites which are legal and permitted by sovereign laws of that sovereign nation.

In August 2006, the WTO dispute process resulted in a finding that the United States had violated the terms of the WTO with regard to the grievance of Antigua and Barbuda in regard to the business of operating Internet Casino websites which are legal and permitted by law in that nation.  The United States contended that gambling and gambling related activities were not contemplated by it when it became a signatory.  The basis of the decision was that the United States created barriers to the cross-border Internet Casino website industry by inconsistent regulation of Internet gambling on a Federal level, both internally and across international borders, permitting some ostensibly illegal activities while prohibiting some facially legal activities, and prohibiting all foreign Internet gambling activities.

In March 2007 the WTO Appellate Panel affirmed its ruling that the United States was not in compliance with the ruling of the WTO in the dispute as aforesaid, thereby permitting Antigua and Barbuda to impose sanctions. This provision also shows that since the original proceeding the United States had an opportunity to remove the ambiguity and thereby comply with the recommendations and rulings of the DSB.205 Instead, rather than take that opportunity, the United States enacted legislation that confirmed that the ambiguity at the heart of this dispute remains and, therefore, that the United States has not complied.

VII. CONCLUSION

7.1 For the reasons set out in this Report, the Panel concludes that the United States has failed to comply with the recommendations and rulings of the DSB in this dispute. 07-209 U Part 1WT/DS285/RW *United States - Measures Affecting the Cross-border Supply of Gambling and Betting Services* - Recourse to Article 21.5 of the DSU by Antigua and Barbuda - Report of the Panel dated March 30, 2007, paragraph 6.135.

A spokesperson for the United States Office of Trade Relations, John K. Veroneau, stated in May 2007 that the United States will not appeal the decision; instead it will try to withdraw its treaty commitment to the WTO as regards Internet gambling. *See* www.ustr.gov.Document library for May 4, 2007.

Congress, on or about October 6, 2006, passed a law entitled "The Unlawful Internet Gambling Enforcement Act of 2006," codified as 31 *U.S.C.* § 5361, *et seq.* (hereinafter referred to as the "UIGEA" or the "Act") and signed into law by President Bush on October 13, 2006. The UIGEA creates an offense entitled "unlawful Internet gambling," which the UIGEA defines as to "place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received or otherwise made," according to 31 *U.S.C.* § 5362(10)(A). The UIGEA imposes criminal liability on any person or entity violating 31 *U.S.C.* § 5363, including a term of imprisonment of up

to five (5) years. Under the UIGEA, 31 *U.S.C.* § 5362(10)(A), unlawful Internet gambling means to "place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet is initiated, received or otherwise made." Thus, the UIGEA criminalizes the financing of betting or wagering by financial institutions such as banks, clearing houses and other financial institutions licensed by the Defendant Federal Reserve System, financial services known as payment system instruments, as well as financial companies issuing credit cards

Under the UIGEA, 31 *U.S.C.* § 5362(10)(E), the intermediate routing of electronic data does not determine the location or locations in which a bet or wager is initiated, received, or otherwise made, but the UIGEA punishes as a criminal act any content-neutral transmittal of the funds used for a bet or wager if the originating or end point makes Internet and/or Online Casinos gambling illegal. The UIGEA also punishes as a criminal act the knowing acceptance of any credit or electronic fund transfer by any person or entity in connection with the participation of another person in unlawful Internet gambling under 31 *U.S.C.* §5363(1-4).

The UIGEA further permits the Defendant Attorney General and/or any duly empowered official of the Defendant Commission or Defendant Board, in addition to criminal penalties, to seek civil remedies including, but not limited to, injunctions which would restrain restricted transactions under the UIGEA's regardless whether a criminal prosecution has been initiated, pursuant to 31 *U.S.C.* § 5365(b)(1) or by an Attorney

13

General or other appropriate official of the several states pursuant to 31 *U.S.C.* § 5365(b)(2).

The UIGEA, 31 *U.S.C.* § 5364(a), further requires the Defendants Board and Commission, acting together with or apart from the Defendant Attorney General, to adopt regulations within two hundred and seventy (270) days of the effective date of the UIGEA, or no later than July 10, 2007, which would require financial institutions such as banks, clearing houses and other financial institutions licensed by the Federal Reserve System, financial services issuing instruments known as payment system instruments, as well as financial companies which have issued credit cards to persons wishing to engage in games of chance and/or skill and wagering on them with the said Internet Casino websites, to implement systems to identify and block, prevent or otherwise prohibit transactions which are restricted by the UIGEA. As of this date, no regulations have been introduced by the Board, the Commission, or the Attorney General. Further, no regulations have been adopted by any of the Agencies required to do so.

There are pending prosecutions under the Wire Act, 18 *U.S.C.* § 1084, and other provisions of Federal law in the Eastern District of Missouri under Indictment No. 4:06-CR-337-CEJ (MLM), in the matter of *United States v. Carruthers, et al.*. An indictment has been returned under the Wire Act, 18 *U.S.C.* § 1084, and other Federal laws, in the District of Utah in the matter of *United States v. CurrenC Worldwide, et al.,* for which no indictment number is currently available. Criminal complaints have been unsealed in the Southern District of New York in the matters of *United States v. Lawrence* and *United States v. LeFebvre,* for which no docket number or indictment number is currently available.

14

The United States also indicted, earlier this year, two (2) individuals in the Southern District of New York for money-laundering. They are, or were, the executives of Neteller, P.L.C., a legally operating company organized and publicly traded in the United Kingdom. Press Release 07-012, United States Attorney, Southern District of New York, *U.S. Charges Two Founders of Payment Services Company with Laundering Billions of Dollars of Internet Gambling Proceeds,* January 16, 2007. They were charged with conspiring to transfer funds with the intent to promote Internet gambling. Neteller was accused of "laundering" money, because bettors transferred money to Neteller and Neteller in turn transferred the money to Internet Casino websites where the bettors were playing. The allegations refer to the activity as "laundering" because Internet gambling is termed purportedly illegal.

Further, the United States recently subpoenaed financial institutions such as HSBC, Credit Suisse and Deutsche Bank, which underwrote initial public offerings of offshore Internet Casino website businesses. New York Times On-Line, *Gambling Subpoenas on Wall Street,* January 22, 2007. That article also reported the cessation of acceptance of Internet bets from the United States by BetonSports.com, a sports wagering company, "crippling its business." Even with prosecution or injunction aside for the moment, iMEGA's members have lost significant revenues since the UIGEA was passed. iMEGA's members have been advised that banks, clearing houses, financial services issuing payment system instruments, as well as credit card companies have discontinued the acceptance of funds for transfer by persons wishing to bet or wager with iMEGA members' Internet Casino websites because of the imminent threat of criminal prosecution, forfeiture and other penalties under the Act.

The treatment among the Federal government and various states of gambling in its many forms, including lotteries, pari-mutuel horse racing, games of chance, casinos, Indian casinos, sports betting, and other forms of gambling is uneven. The following Table One summarizes state laws, as of 2005, regarding "gambling" and Internet gambling in its simplest forms. In Table One, the authors defined the following categories, summarized according to each state's laws.

Dominant Factor Test Applied: where the elements of skill predominate over the elements of chance in determining outcome, then the "chance" element is lacking and the game involved does not violate that state's anti-gambling law. This question considers whether the state applies this "dominant factor," or predominance, test.

Social Gambling Allowed: whether playing for money in a purely social context is allowed, or at least probably legally overlooked. A "social context" usually means that no player or other person, like a bookie or the host of the game, makes or earns anything other than as, and on an equal footing with, a mere player in the contest or game.

Misdemeanor vs. Felony: grading is not consistent in all states. Some states distinguish on the basis of the place of possible incarceration. Most states draw the distinction based on the term of the possible sentence, with a punishment of one year or less being a misdemeanor and a longer possible sentence defining a felony. The latter approach is used in compiling the chart.

Simple vs. Aggravated: The distinction between "simple" and "aggravated" gambling is also one that varies from state to state. The approach used in compiling the chart is generally based on the presence of professional gambling, which involves those who make money on the contest or game other than as, and on an equal footing with, a mere player.

Express Internet Prohibition: The response to this question goes to whether a state has adopted a specific law criminalizing the offering and/or playing of gambling games offered over the Internet. The fact that a state has not passed a specific law does not make participation in or offering of gambling over the Internet legal under the laws of that state.

## TABLE ONE- STATE BY STATE GAMBLING SUMMARY

| State | Dominant Factor Test Applied | Social Gambling Allowed | Penalty for Simple Gambling | Penalty for Aggravated Gambling | Express Internet Prohibition |
|---|---|---|---|---|---|
| Alabama | Yes | Yes | Misdemeanor | Misdemeanor | No |
| Alaska | Yes | Yes | Misdemeanor | Felony | No |
| Arizona | No | Yes | Misdemeanor | Felony | No |
| Arkansas | No | No | Petty | Misdemeanor | No |
| California | Effectively, Yes | Yes | Misdemeanor | Misdemeanor | No |
| Colorado | Yes | Yes | Petty | Misdemeanor | No |
| Connecticut | Yes | Yes | Misdemeanor | Misdemeanor | No |
| Delaware | Questionable | Yes | Misdemeanor | Misdemeanor | No |
| Dist. of Columbia | Yes | Probably | Felony | Felony | No |
| Florida | No | $10 Limit (1) | Misdemeanor | Misdemeanor | No |
| Georgia | Yes | No | Misdemeanor | Felony | No |
| Hawaii | Yes | Yes | Misdemeanor | Felony | No |
| Idaho | Yes | No | Misdemeanor | Misdemeanor | No |
| Illinois | No | No | Misdemeanor | Misdemeanor | Yes |
| Indiana | Yes | No | Misdemeanor | Felony | Yes |
| Iowa | No | No(2) | Misdemeanor | Misdemeanor | No |
| Kansas | Yes | No | Misdemeanor | Felony | No |
| Kentucky | Yes | Yes | Misdemeanor | Felony | No |
| Louisiana | No | Yes | Misdemeanor | Felony | Yes |
| Maine | Yes | Yes | Misdemeanor | Felony | No |
| Maryland | No | No | Misdemeanor | Felony | No |
| Massachusetts | Yes | Unclear | Misdemeanor | Misdemeanor | No |
| Michigan | Yes | No (3) | Misdemeanor | Misdemeanor | No (4) |
| Minnesota | Yes | Yes | Misdemeanor | Misdemeanor | No |
| Mississippi | Yes | No | Misdemeanor | Misdemeanor | No |
| Missouri | Yes | No | Misdemeanor (5) | Felony | No |
| Montana | Questionable | Yes | Misdemeanor | Misdemeanor | Yes |
| Nebraska | Yes | No | Misdemeanor | Misdemeanor | No |
| Nevada | Yes | Yes | Misdemeanor | Felony | Yes |
| New Hampshire | Yes | No | Misdemeanor | Felony | No |
| New Jersey | Yes | Yes | disorderly | Crime | No (6) |
| New Mexico | Yes | Yes | Misdemeanor | Felony | No |
| New York | Yes | Yes | Misdemeanor | Felony | No |
| North Carolina | Yes | No | Misdemeanor | Misdemeanor | No |
| North Dakota | Yes | Yes (7) | Misdemeanor | Felony | No |
| Ohio | Yes | Yes | Misdemeanor | Felony | No |
| Oklahoma | Yes | No | Misdemeanor | Felony | No |
| Oregon | Yes | Yes | Misdemeanor | Felony | Yes |
| Pennsylvania | Yes | Unclear | Misdemeanor | Misdemeanor | No |
| Rhode Island | Yes | No | Misdemeanor | Felony | No |
| South Carolina | Yes | Yes | Misdemeanor | Misdemeanor | No |
| South Dakota | Yes | No | Misdemeanor | Misdemeanor | Yes (8) |
| Tennessee | Questionable | No | Misdemeanor | Felony | No |
| Texas | Yes | Yes | Misdemeanor | Misdemeanor | No |
| Utah | Yes | No | Misdemeanor | Felony | No |
| Vermont | Questionable | Fine Only | Misdemeanor | Misdemeanor | No |
| Virginia | Yes | Yes | Misdemeanor | Felony | No |

| Washington | Yes | Yes | Misdemeanor | Felony | Yes (9) |
|---|---|---|---|---|---|
| West Virginia | Yes | No | Misdemeanor | Misdemeanor | No |
| Wisconsin | Yes | No | Misdemeanor | Felony | Yes |
| Wyoming | Yes | Yes | Misdemeanor | Felony | No |

Footnotes:

(1)  Florida authorized licensed card rooms to offer poker limits of $2 per bet, with a limit of 3 raises per betting round, effective July 1, 2003.

(2)  Iowa permits social gambling, but only to the extent that a player may win or lose no more than $50 or other consideration equivalent thereto in all games and activities at any one time during any period of twenty-four consecutive hours or over that entire period.  See Iowa Code 99B.12(1)(g)

(3)  Michigan has exceptions for Senior citizens homes and state fairs.

(4)  In 1999 Michigan adopted SB 562 which made it specifically unlawful to use the Internet to violate certain provisions of Michigan's anti-gambling laws (Mich. Complied Statutes 750.301 through 750.306 and 750.311.)  In 2000 Michigan adopted Public Act 185 which repealed the references to those anti-gambling sections.  Thus, Michigan is *not* a state that has in effect a specific prohibition against using the Internet to make, offer or accept bets over the Internet.

(5)  Missouri's felony penalty applies only to a "professional gambler" as defined.

(6)  New Jersey Senate Bill 1013 seeks to clarify definition of illegal gambling to address Internet gambling; void credit card debt incurred through illegal gambling; authorize only the State to recover illegal gambling losses and to outlaw online gambling.  Also introduced in previous legislative session as S2376.  As of July 4, 2005, S1013 has not been reported out of the New Jersey Senate Wagering, Tourism & Historic Preservation Committee.

(7)  North Dakota has a limitation of $25 per individual hand, game or event.  Betting over $25 is an infraction and it becomes a misdemeanor when the amount exceeds $500.

(8)  South Dakota's prohibition applies to those in the "gambling business."

(9)  Prohibition becomes effective June 7, 2006.

Drawn from www.gambling-law-us.com/State-Law-Summary, cited in Methenitis, Mark, *Internet Gambling Regulation Present and Future: Technology Outpaces Legislation as the MMORPG Problem Emerges*, ___ Texas Tech University School of Law ___, December 2005; *see also* Schwartz, Joel Michael, *The Internet Gambling Fallacy Craps Out*, 14 Berkeley Technology Law Journal 1021, 1032-1037 (1999).

## PROCEDURAL HISTORY

Plaintiff has filed a Verified Complaint with an application for issuance of a Temporary Restraining Order to restrain the enforcement of any statutory or regulatory authority under the Act

## LEGAL ARGUMENT

### Point One

### The Standard of Review.

Under 28 *U.S.C.* § 1331, a Federal district court has original subject matter jurisdiction over an action for injunctive relief based on constitutional claims. *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 *F.3d* 144, 156 n. 12 (3d Cir.2002), *cert. denied*, 539 *U.S.* 942, 123 *S.Ct.* 2609 (2003).  In order to obtain preliminary injunctive relief, the moving party must establish: (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.  *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 *F.3d* 700 (3rd Cir. 2004); *Forum for Academic & Institutional Rights, Inc. v. Rumsfeld*, 390 F.3d 219 (3rd Cir. 2003); and, *Allegheny Energy, Inc. v. DQE, Inc.*, 171 *F.3d* 153 (3rd Cir. 1999).  One of the goals of a preliminary injunction is to maintain the *status quo*, defined as the last, peaceable, noncontested status of the parties.  *Opticians Association of America v. Independent Opticians of America*, 920 *F.2d* 187 (3d Cir. 1990).  Because a preliminary injunction is an extraordinary remedy, the "right to relief must be clear and unequivocal." *Id.*  In deciding whether to grant a preliminary injunction, a district court must consider whether the plaintiffs have demonstrated that they are likely to prevail on the merits. *Doran v. Salem Inn, Inc.*, 422 *U.S.* 922, 931, 95 *S.Ct.* 2561 (1975).  The court also must consider whether the plaintiff has shown irreparable injury. *Id.*

Such being the case, however, '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 *U.S.* 347 (1976). In constitutional litigation over legislation attempting to regulate private conduct, as will be shown in Points Two and Three, *infra,* the Government bears the burden of proof on the ultimate question of constitutionality and Plaintiffs must be deemed likely to prevail unless the Government has shown that demonstrated less restrictive alternatives are less effective than the statute being challenged. *Ashcroft v. American Civil Liberties Union*, 542 *U.S.* 656, 665, 124 *S.Ct.* 2783, 2792 (2004). "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Pappan Enter., Inc. v. Hardee's Food Sys., Inc.*, 143 *F.3d* 800 (3d Cir. 1998). An act that threatens an ongoing business with destruction causes that business irreparable injury, whether viewed as an injury not compensable in monetary terms or as one which cannot be reduced to monetary value with "sufficient accuracy to make damages an adequate substitute" for injunctive relief.

The Plaintiff has standing as an Association in this case to challenge the statute in question. A group that engages in some form of public or private expression above a *de minimus* threshold is an "expressive association" for standing purposes. The group need not be an advocacy group or exist primarily for the purpose of expression. *Boy Scouts of America v. Dale*, 530 *U.S.* 655, 648, 120 *S.Ct.* 2446, 2454-2455 (2000); *Forum for Academic & Institutional Rights, Inc. v. Rumsfeld*, 390 *F.3d* 219, 231; *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 *F.3d* 435, 443 (3d Cir.2000). In a pre-enforcement challenge to a statute carrying criminal penalties, standing exists when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with

a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.,* 484 *U.S.* 383, 392-93 (1988); *Babbitt v. United Farm Workers Nat. Union,* 442 *U.S.* 289, 298 (1979).   Further, an Association has standing to assert the claims of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to their association's purpose; and, (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.   An Association has constitutional standing when it seeks judicial relief in its own right to redress an injury to the organization itself. Under the leading case of *Hunt v. Washington State Apple Adver. Comm'n,* 432 *U.S.* 333, 343 (1977), iMEGA has associational, constitutional standing since its own conduct in advocacy of Internet Gambling is threatened by UIGEA's prohibitions, and its members and those with the same interests are threatened with criminal prosecution under UIGEA for promoting and soliciting Internet gambling business, as well as accepting bets for the same.   There are no damages claims asserted in this litigation, only requests for temporary and permanent injunctions. A request for declaratory and injunctive relief does not require individualized proofs and therefore, is properly resolved in a group context on the issue of "associational standing" to sue.

In addition, an Association may assert the rights of its members, so long as the challenged actions adversely affect its members' associational ties. The Association must allege that its members, or any one of them, are suffering immediate or threatened injury, including seizure of property or criminal prosecution under the challenged statute as a result of the challenged statute, make out a justiciable case had the members themselves

brought suit. *American Civil Liberties Union v. Gonzales,* 2006 WL 2927284 (E.D.Pa. 2006).

Finally, the case presents a proper case and controversy for a declaratory judgment and injunction against enforcement of the UIGEA because a constitutional controversy clearly exists between the Plaintiff and the Defendant Attorney General, Defendant Commission and Defendant Board, who must enforce the law against iMEGA and its members, prosecute violators and adopt regulations for enforcement. *See Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 *U.S.* 270, 272 (1941). A declaratory judgment action here will present a justiciable controversy rather than "abstract, hypothetical or contingent questions." *Alabama State Federation of Labor v. McAdory*, 325 *U.S.* 450, 461 (1945). The requirement is satisfied when "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 *F.2d* 643, 647 (3d Cir. 1990); *St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 *F.3d* 232, 240 (3d Cir. 2000). The case is justiciable if there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Khodara Environmental, Inc. v. Blakey*, 376 *F.3d* 187 (3d Cir. 2004).

For all the reasons set forth under the standards of review in this case, Plaintiff submits it is entitled to a preliminary injunction against the enforcement of UIGEA and ultimately, a declaration that the UIGEA is unconstitutional. The case is justiciable, the Plaintiff has standing to assert its own and its members' interests, criminal prosecution is

likely and, as shown below, the statutory scheme is likely to fail strict scrutiny and be declared unconstitutional.

## POINT TWO

### The UIGEA Unconstitutionally Restricts Gambling On the Internet as a Form of Consensual Private Conduct, Which is Legal in New Jersey and Other States.

Not too long ago, Supreme Court Justice Kennedy began an opinion confirming privacy rights under the Federal Constitution thusly:

> Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home. And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence. Freedom extends beyond spatial bounds. Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct. The instant case involves liberty of the person both in its spatial and in its more transcendent dimensions.

*Lawrence v. Texas,* 539 *U.S.* 558, 562, 123 *S.Ct.* 2472, 2476 (2003). *Lawrence* struck down an anti-sodomy statute in Texas which prohibited sodomy between members of the same sex. Defendant and his companion were arrested after the police arrived and entered their home in response to a purported domestic violence call. The Defendant and his companion were observed having anal sex and were arrested for violation of the statute. The court phrased the question presented as "whether the petitioners were free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution." *Id.* at 564, *S.Ct.* at 2473. In striking down the conviction on constitutional grounds, the Court stated that:

> Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests. If protected conduct is made criminal and the law which does so

> remains unexamined for its substantive validity, its stigma might remain
> even if it were not enforceable as drawn for equal protection reasons.

*Id.* at 575, *S.Ct.* at 2482.   The court struck down the Texas law and convictions

thereunder based upon the fact that the law proscribed private, consensual conduct which

did not involve minors, force or public conduct, and was subject to increasing acceptance

and uneven treatment as a crime from state to state. *Id.*

> Content-based prohibitions, enforced by severe criminal penalties, have
> the constant potential to be a repressive force in the lives and thoughts of a
> free people. To guard against that threat the Constitution demands that
> content-based restrictions on speech be presumed invalid. . . . and that the
> Government bear the burden of showing their constitutionality. *Id.* at 660,
> *S. Ct.* at 2788.

*Lawrence* requires that a court examine any law attempting to restrict private

consensual conduct "for its substantive validity."   Therefore, examining the UIGEA's

regulation of Internet gambling,  the first reason that the court should restrain any further

enforcement of the UIGEA is because it unconstitutionally interferes with private

conduct in an unevenly applied landscape of state and Federal regulation, where, as in

*Lawrence,* the legal status of the prohibited conduct was uneven and unevenly enforced.

There were several reasons advanced for the adoption of this Act by sponsors and

supporters.  The sponsors of the UIGEA dealt with the subject matter, gambling on the

Internet, as a moral dilemma, placing this legislation squarely on all fours with *Lawrence.*

They cited cases of suicide, damage to the fabric of the American family, gambling by

minors, and financial ruin.  Other supporters cited loss of tax revenue from unregulated

billions in gambling revenues. *Congressional Record,* 109th Congress Debate.  R on H.R.

4411, July 13, 2006 at Govtrac.com/H.R. 4411 [109th]: Internet Gambling Prohibition

and Enforcement Act.   Rep. Robert Goodlatte [R-VA], one of the sponsors, stated,

"anecdotal evidences simply help to point out what is a magnifying problem of family problems, bankruptcy problems, problems with minors gambling, problems with addiction to gambling, problems with organized crime's being involved in gambling, all of which goes completely out of the purview of the States, which have jurisdiction over gambling in the United States." *Id.* at 18-19.

Adding further to the moral basis for the legislation, Rep. John Duncan [R-TN] stated "[s]everal million people already are addicted to one form of gambling or another. This problem is going to grow, and many families will suffer if government keeps promoting gambling, and especially if it can be done by pushing a few buttons in the privacy and comfort of a home. The Internet is addictive for many people, anyway, and online gambling can be doubly addictive. We need to put modest and reasonable limitations in place on Internet gambling. . . . " *Id.* at 32-33.

Rep. Thomas Osborne [R-NE] opined that ". . . gambling causes poverty. It causes poverty, in many cases, as much as the wage actually paid an individual. It causes family dysfunction. It causes crime, embezzlement, theft.  There is nothing that we can do right now at this particular time that I think is more germane to the welfare of families and people in the United States than this legislation. *Id.* at 35.

Opponents pointed out the gambling laws from state to state vary, that the bill had exceptions which allowed interstate gambling industries to continue due to other ongoing litigation, and that the legislation smacked of authoritarianism and infringement of fundamental rights.  Rep. Shelley Berkley [D-NV] stated, "I was raised in Las Vegas, Mr. Speaker, where gambling is legal. . . . When it comes to gambling online, there is nothing, nothing, let me repeat that as loudly as possible for everyone to hear, there is

nothing in this legislation that is going to protect college kids on campus from gambling online. We are talking about off-shore gambling sites, Internet sites that are outside of the reach of our judicial system and our regulators." *Id.* at 50-51.   Rep. Barney Frank [D-MA] questioned whether "gambling on the Internet does not add to the GDP or make America competitive. Has it become the role of this Congress to prohibit any activity that an adult wants to engage in voluntarily if it doesn't add to the GDP or make us more competitive? What kind of social, cultural authoritarianism are we advocating here? " *Id.* at 79.

The complex problems concerning regulation of the Internet Casino website industry and indeed, much of the present day Internet landscape, are compounded by a growing body of law applying more traditional analysis and valued precedent to the "moving target" of the pervasiveness and inventiveness of the Internet, its uses, and its users.

> The advent of the Internet presents a new and unique challenge for regulators. Unlike traditional casinos, Internet gambling sites cannot be shut down by merely chaining the doors.. . . . In fact, unlike gaming of the past, Internet gambling does not even need to be hosted in the state or the country where the player logs in. The fact that Internet gambling knows no boundaries adds an additional layer of complexity that distinguishes it from its predecessors.

Schwartz, Joel Michael, *The Internet Gambling Fallacy Craps Out,* 14 *Berkeley Technology Law Journal* 1021, 1032-1037 (footnote deleted) (1999).

The prohibition of the UIGEA extends also to the promotion of Internet gambling through use of payment system instruments, which reaches iMEGA's promotional conduct as well as the advertising activities of its members. However, the debate does not leave iMEGA or its members' interests without remedy. First, in *Lawrence, supra,*

the Court applied basic constitutional principles to strike down the law in question because it legislated public morality and stigmatized a private choice:

> The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives. These considerations do not answer the question before us, however. The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law. Our obligation is to define the liberty of all, not to mandate our own moral code. *Id.* at 571, *S. Ct.* at 2480 (citation omitted; emphasis provided).

*Lawrence* further found that the trend among states and nations as well was to decriminalize consensual sodomy between same sex individuals in the privacy of the home. *Id.* at 573, *S. Ct.* at 2481. This inconsistency of view, legality and enforcement is also found in context of the UIGEA landscape as noted above and below in Point Four, *infra*. The Court, in *Lawrence,* found that the criminalized conduct did not involve minors, persons who might be injured or coerced or where consent might not easily be refused. The prohibited conduct did not involve public conduct or prostitution. It only involved consenting conduct out of the public's eye. The Court therefore reversed the Texas conviction, holding:

> Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom. *Id.* at 579, *S.Ct.* at 2484.

Further, the United States Supreme Court, while recognizing the compelling state interest in protecting children from unsolicited sexual literature, has struck down

regulations which controlled Internet-based access to sexual literature <u>where the access was consensual and the service had to be accessed by a listener willing to pay for the service</u>. *Sable Communications of California, Inc., v. FCC*, 492 *U.S.* 115 (1989). At least one court has applied this analysis in an Equal Protection matter to the disparate treatment of casino gambling between the states and by the Federal government.  In an unreported case interpreting the effect of a state constitutional provision barring advertising for some kinds of gambling but not others, the Federal District Court in *Ass'n of Charitable Games of Mo. v. Missouri Gaming Com'n*,  WL 602050, (W.D. Mo. 1998) stated:

> The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." . . . The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States. . . . In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose. . . .  Accordingly, the advertising restrictions, which infringe upon Charitable Games' First Amendment rights, see supra, <u>cannot survive this court's strict scrutiny of disparate treatment of casino operators-- absent a conclusion, which I have rejected, that they are narrowly and precisely tailored to support a compelling governmental interest.</u> *Id.* at 12- 13 (emphasis provided).

As noted in the debate on this issue in the House, the proponents of the Act brought forward similar notions of public morality and public protections in arguing that the Act was necessary to protect minors from gambling or incurring gambling debt that might lead them to crime.  They cited the theoretical use of Internet gambling to fund terrorism.  They cited the risk to families of financial ruin, foreclosure and debt from problem or excessive gambling.  Finally, they asserted as a distinct, and somewhat contrary, reason for banning Internet gambling the inability of a state to tax gambling transactions which may have some nexus with the state.  However, even as they noted

these reasons to ban Internet gambling, proponents of such regulation over the years have conceded that Internet gambling, for the gambler, is a private, consensual activity conducted over one's own Internet-connected computer.[1]   However, prior to the enactment of the UIGEA at least one (1) Circuit Court of Appeals had declared that the transfer of funds for betting or wagering by such financial institutions for Internet Casino website gambling was not and is not an illegal act under the Wire Act. *In Re MasterCard Litigation,* 313 *F.3d* 257 (Fifth Cir. 2002) was a multijurisdiction litigation consolidated in the Louisiana U.S. District Court, where Plaintiffs challenged gambling debts they had incurred while gambling at Internet Casino websites.   They sued their payment instrument companies, alleging that use of payment instruments to bet was a violation of the Wire Act. However, the court ruled that "[b]ecause the Wire Act does not prohibit non-sports internet gambling, any debts incurred in connection with such gambling are not illegal." *Id.* at 263.   Further, a Federal District Court has ruled that a contract action for collection of a debt incurred in Internet gambling can proceed in the jurisdiction where the debtor resides, implicitly validating the transactions upon which they were based. *Thompson v. Handa-Lopez, Inc.,* 998 *F.Supp.* 738 (W.D. Texas 1998).

Plaintiff submits that this court should focus, not on the anecdotal public morality arguments advanced to support the UIGEA's enactment, but on the zone of fundamental privacy guaranteed by the Constitution where Internet gambling occurs.   As shown, under

---

[1] *See* Lessani, Andrea M., *How Much Do You Want to Bet That the Internet Gambling Prohibition Act of 1997 Is Not the Most Effective Way to Tackle the Problems of Online Gambling?* The UCLA Online Institute for Cyberspace Law and Policy, May 1998; Schwartz, Joel Michael, *The Internet Gambling Fallacy Craps Out,* 14 *Berkeley Technology Law Journal* 1021, 1032-1037 (1999); Methenitis, Mark, *Internet Gambling Regulation Present and Future: Technology Outpaces Legislation as the MMORPG Problem Emerges,* ___Texas Tech University School of Law ___, December 2005; Comment of Senator Jon Kyl on passage of Unlawful Internet Gambling Enforcement Act, Congressional Record, Senate, Page S11045-S11046, Nov. 16, 2006.

*Lawrence,* the UIGEA unconstitutionally interferes with the consensual right of an individual to engage in betting over the Internet when the act of betting is private, consensual and otherwise legal. The government's interference with this fundamental right, under the guise of regulation only of payment instruments used to finance Internet gambling, not only threatens the interests and very livelihood of iMEGA's members, but extends far further to cut deeply into fundamental freedoms of the individual to engage in conduct which is otherwise legal. Therefore, Plaintiff respectfully requests this court declare the UIGEA illegal and restrain its enforcement.

### POINT THREE

**By Criminalizing Any Financial Transaction Relating to
Internet Gambling, The Act's Selective Prohibitions Do Not
Constitute the Least Restrictive Means to Regulate Private Consensual
Conduct On the Internet.**

The United States Supreme Court set further precedent in the realm of privacy rights in the Internet age in *Ashcroft v. American Civil Liberties Union,* 542 *U.S.* 656, 124 *S.Ct.* 2783 (2004). *Ashcroft* involved a challenge to a second attempt by Congress to regulate the Internet to prevent child pornography and make cyberspace safe for minors by criminalizing certain Internet speech through the Child Online Protection Act (hereinafter referred to as "COPA"), 47 *U.S.C.* § 231, *et seq.* COPA imposed criminal penalties of a $50,000 fine and six (6) months in prison for the knowing posting, for "commercial purposes," of World Wide Web content that is "harmful to minors." 47 *U.S.C.* § 231(a)(1). "For commercial purposes" was defined in COPA as "making any communication on the Internet that includes any material defined as harmful to minors by devoting time, attention, or labor to such activities, as a regular course of such person's trade or business, with the objective of earning a profit as a result of such activities." 47

*U.S.C.* § 231(e)(2).  Plaintiffs sued to enjoin the enforcement of the act and adoption of regulations pursuant to the statute.

The Supreme Court reviewed the matter after the trial court and the Third Circuit Court of Appeals found the statute unconstitutional and the matter was remanded from the Supreme Court with guidelines for further consideration.  Ultimately the Supreme Court upheld the District Court's grant of a preliminary injunction.

> Content-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people. To guard against that threat the Constitution demands that content-based restrictions on speech be presumed invalid, . . . and that the Government bear the burden of showing their constitutionality, . . . This is true even when Congress twice has attempted to find a constitutional means to restrict, and punish, the speech in question. *Id.* at 660, *S. Ct.* at 2788 (citations omitted).

The Court relied solely on the District Court's narrow grounds for decision.  The trial court granted the motion for preliminary injunction, concentrated primarily on the argument that there are plausible, less restrictive alternatives to COPA. A statute that "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another ... is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Id.* at 665, *S. Ct.* at 2791.  The Court, in *Ashcroft,* held that the government bore the burden of proof on the ultimate question of COPA's constitutionality, and that  respondents must be deemed likely to prevail unless the government demonstrated that respondents' proposed less restrictive alternatives are less effective than COPA. *Id.* at 666, *S. Ct.* at 2791-2792.

The Court, in *Ashcroft,* sustained the Plaintiffs' challenge and the trial court's preliminary injunction against enforcing the act because "on [the] record there are a

number of plausible, less restrictive alternatives to the statute." The Court held that
blocking and filtering software is an alternative that is less restrictive than COPA, and, in
addition, likely more effective as a means of restricting children's access to materials
harmful to them. The District Court, in granting the preliminary injunction, did so
primarily because the plaintiffs had proposed that filters are a less restrictive alternative
to COPA, which impose selective restrictions on speech at the receiving end, not
universal restrictions at the source, and the Government had not shown it would be likely
to disprove the plaintiffs' contention at trial. *Id.* at 666-667, *S. Ct.* at 2791-2792.
Further, the Court held that "[a]bove all, promoting the use of filters does not condemn as
criminal any category of speech, and so the potential chilling effect is eliminated, or at
least much diminished. <u>All of these things are true, moreover, regardless of how broadly
or narrowly the definitions in COPA are construed.</u>" *Id.* at 667, *S.Ct.* at 2792 (Emphasis
provided). The Court further noted that a Congressional Committee convened
specifically to evaluate means of restricting access overwhelmingly found filtering to be
most effective. *Id.*

Finally, the Court evaluated the context of possible criminal prosecutions under
the statute and found that possibility justified the temporary injunction. "There are also
important practical reasons to let the injunction stand pending a full trial on the merits.
First, the potential harms from reversing the injunction outweigh those of leaving it in
place by mistake. Where a prosecution is a likely possibility, yet only an affirmative
defense is available, speakers may self-censor rather than risk the perils of trial." *Id.* at
671, *S.Ct.* at 2794. In this case, iMEGA has shown that there are prosecutions under the
Wire Act for the same conduct in Utah and New York at this time, even though the

transfer of funds for betting or wagering by such financial institutions for Internet Casino website gambling has been validated in *In Re MasterCard Litigation, supra.*

In addition, the restrictions in UIGEA against providing any information regarding on-line gambling in 31 *U.S.C.* 5362(1)(D) clearly violate iMEGA's rights in relation to expression and advocacy of its interest in Internet interactive entertainment. The United States Supreme Court in *Boy Scouts of America v. Dale*, 530 *U.S.* 640, 120 *S.Ct.* 2446 (2000), used a three-step process to analyze the Boy Scouts' expressive association claim that they could not be compelled under the State of New Jersey's Law Against Discrimination, *N.J.S.A.* 10:5-2, *et seq.,* to accept openly homosexual leaders against their professed principles. First, the Court considered whether the group making the claim engaged in expressive association. The Court then analyzed whether the state action at issue significantly affected the group's ability to advocate its viewpoints. *Id.* at 649-650, *S. Ct.* at 2452. Finally, it weighed the state's interest implicated in its action against the burden imposed on the associational expression to determine if the state interest justified the burden. *Id.* at 655, *S.Ct.* at 2456.

The Court held that the Boy Scouts could not be compelled to admit avowed homosexuals under threat of applicaton or prosecution under the Law Against Discrimination because forcing such action would violate the organization's right to expressive association under the First Amendment. *Id.* at 655, *S.Ct.* at 2456. *See also Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh*, 229 *F.3d* 435 (3d Cir. 2000), where the Third Circuit Court of Appeals held that a fraternity which was placed on probation for lack of responsibility by University Officials was not entitled to expressive associational protection under the First Amendment, where the alleged actions did not

33

concern or punish any expressive conduct. In *Dale,* enforcement of the Law Against Discrimination against an organization with a specific message a compelling interest, whereas in *Phi Lambda* no expression under the First Amendment was involved. "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends.'" *Sable Communications of Cal., Inc.* v. FCC, 492 *U.S.* 115, 127, 109 *S.Ct.* 2837 (1989).

In this case, the technology has improved even past the point where it was able to neutrally and effectively prevent any access to illegal or unwanted activity[2]. Filtering is able to simply, effectively and privately eliminate any contact with an Internet Casino website if the individual wishes. The same filtering can control and eliminate minor children contacting an Internet Casino. The latest versions of the two main computer-operating systems, Microsoft's Windows Vista® and Apple's Mac OS X Tiger®, have parental controls built right in. Certification of Edward Leyden, **Exhibit 4.**

> On both platforms, you can control even which programs a child can run. This is key, because it prevents kids from running alternative Web browsers or other programs that may not be susceptible to parental controls. Both also allow you to specify which Web sites a child can visit, another crucial feature. These built-in controls are free of charge and fairly easy to use. Even better, because they are designed by the same companies that built the operating system and aren't bolted on afterward, they can impose limits in ways that kids may find harder to evade.

> Once logged in to your administrator account, you can apply different limits to each child's account. In Windows Vista, you can find the parental-controls settings in the Control Panel, under the heading User Accounts and Family Safety. . . .

> . . . Vista, but not the Mac, allows you to set time limits for a child's use of the computer. Another strong Vista feature absent on the Mac is a detailed report on

---

[2] "[T]he factual record does not reflect current technological reality-a serious flaw in any case involving the Internet. The technology of the Internet evolves at a rapid pace. . . . It is reasonable to assume that other technological developments important to the First Amendment analysis have also occurred during that time. More and better filtering alternatives may exist than when the District Court entered its findings. *Ashcroft, supra, at* 672, *S.Ct.* at 2794.

the child's activities that can be emailed to the parent — though the report doesn't include email and instant-messaging activities. <u>Vista also can filter out Web pages based on content categories, such as sex or drugs</u>. (Emphasis provided).[3]

Thus, private consensual Internet gambling by adults, as shown in Point One, is protected conduct under the First Amendment and is unconstitutionally infringed by UIGEA with less restricted means of regulation already in place and already recognized by the United States Supreme Court as a less restrictive means of regulating private conduct. Further, the regulatory scheme is not applied equally to prevent the mischief targeted by its proponents. As shown below, <u>private betting is legal in New Jersey and other states. Moreso, use of computerized payment instruments to deposit wagering money, or to pay gambling debts, is legal in New Jersey without reference to the origin of the payment instrument.</u> The UIGEA therefore strikes too broad, too deep, too wide into private conduct, legal in many areas, and therefore is unconstitutional, especially where technology can eliminate the "public morality" concerns of the UIGEA's proponents without affecting those for whom private Internet gambling is legal. Enforcement of the UIGEA must be enjoined, Plaintiff submits.

## POINT FOUR

### The UIGEA's Inconsistent Regulation of Internet Gambling, And Its Inconsistent Effect Across the States, Renders the UIGEA Unconstitutional.

Under the UIGEA, the key to prevention of Internet gambling is the prohibition of use of payment system instruments to transmit betting funds where the act of gambling is otherwise prohibited, and the promotion of the same for gambling purposes. The UIGEA uses Federal powers to prevent gambling unless, supposedly, states regulate, permit or

---

[3] Mossberg, Walter S., *Personal Technology from The Wall Street Journal, You Have Weapons In Your Computer To Monitor Your Kids,* June 14, 2007, All Things Digital Web site, http://walt.allthingsd.com.

prevent it. But inconsistent, unevenly applied social conduct or "public morality" arguments were rejected by the *Lawrence* court as a basis to support the law's proscription. *Lawrence, supra,* at 568-569, *S.Ct.* at 2478-2479. The Act exempts at least three (3) forms of gambling from its ambit completely: sports fantasy league gambling (which exemption has exceptions of its own); pari-mutuel horse racing; and, interstate lotteries. Furthermore, it exempts from regulation any form of gambling on Tribal lands which, for purposes of the Act and gambling practices, are considered sovereign states, whether such gambling is conducted on a specific Tribal land or between Tribal lands.

However, it is this exemption of many forms of gambling altogether and the blanket effect on all states, even those where a person can legally wager and collect private winnings, which makes the UIGEA's prohibitions illegal. In New Jersey, unlicensed gambling in most forms is illegal, even though the State permits casino gambling in Atlantic City. However, *N.J.S.A.* 2C:37-1(c) exempts a "player" from such prohibitions when that player "engages in any form of gambling solely as a contestant or bettor, without receiving or becoming entitled to receive any profit therefrom other than personal gambling winnings, and without otherwise rendering any material assistance to the establishment, conduct or operation of the particular gambling activity." This statutory exemption also exists in Missouri as set forth in Missouri statute § 572.010-8; Alabama § 13A-12-20(8); and, Alaska § 11.66.280(6); all of which exempt player's personal gambling winnings. Hawaii §712-1231 defines social gambling as a player's betting where the player only wins their personal gambling winnings, but further limits the definition of social gambling to circumstances where no other person besides the player acquires any profit.

Further, in New Jersey, it is legal to accept or send internet or wire transfers of funds for purposes of casino gambling. *N.J.A.C.* 19:45-1.24A provides that a casino can accept a wire transfer or electronic fund transfer from or on behalf of a patron to establish a cash deposit for gambling, to redeem a counter or pay a counter. *N.J.A.C.* 19:45-1.24A(a)(3) specifically authorizes a patron's gambling deposit or payment by computer. Nothing in the regulations refers to the origin of the deposit.

In *Sable Communications, supra,* the United States Supreme Court held that Federal statutes criminalizing the provision of "telephone sex" prerecorded indecent language messages, despite the availability of screening technology and/or use of credit cards, were unconstitutional. Criticizing the legislative debate there as conclusory and lacking in a factual basis that technology in 1989 was not sufficient to limit the communications to consenting, paying adults, the Court stated that there was no invalidity based on the fact that standards of "obscenity" varied from state to state; the statutes failed because they constituted a complete ban on the activity which was protected. *Id.* at 126-130, *S.Ct.* at 2838-2839.

Further, lest the government contend that illegal money laundering also occurs through Internet gambling and Internet Casino websites, regulations already exist to regulate such transactions using Internet-based payment systems, and tighter regulations are scheduled to become effective shortly. Regulations already exist and/or are proposed for adoption which will require all casinos, banks and financial transfer systems to report suspicious transactions. 31 *C.F.R.* § 103.21 will require <u>casinos</u> to report transactions, including Internet transactions, over $5,000.00 which fit a pattern of suspicious activity or are targeted to a known criminal or terrorist destination. Presently the regulations

require report of more than $10,000.00.  Further, the same regulatory provisions will apply to banks, 31 *C.F.R.* § 103.18, and money services, 31 *C.F.R.* § 103.20.

By criminalizing the absolute use of payment system instruments which are constitutionally, and factually, neutral and legal, and which have been held to be such under *In Re MasterCard, supra,* for transmission of personal bets or wagers and earnings from gambling in Alabama, Alaska, New Jersey, Missouri and internationally[4], the UIGEA illegally restricts the neutral legal means by which Plaintiff's members conduct legal business across state and national borders.  In *New Hampshire Motor Transport Ass'n v. Rowe*, 448 *F.3d* 66 (First Cir. 2006), the court invalidated a <u>state</u> regulation on Commerce Clause grounds which criminalized the transport of contraband cigarettes which were ordered over the Internet.  The cigarettes were delivered by common carriers which was legal under Federal regulations so long as the packages were delivered to licensed cigarette retailers or to recipients on a list maintained by the state.  However, the common carriers were guilty of a criminal offense under the law if they delivered to a person not licensed even if the package was unmarked.  The court stated:

> "[i]In reaching this conclusion, we recognize that there is a potential tension between saying that, on the one hand, Maine is free to punish the knowing delivery of material that it has classified as contraband, while, on the other hand, ruling that it may not dictate or interfere with a carrier's delivery procedures. What we are saying here, however, is that Maine cannot use the mechanisms outlined in the statute to impute knowledge based on a failure to read labels or consult lists-an imputation which would amount to prescribing how carriers must operate.

The UIGEA attempts the same illegal sort of "back door" regulation by trying to criminalize the use of payment system instruments, the "carrier" in this analogy, in order to prevent the movement of the purported "contraband", gambling money.   The

---

[4] In addition to Antigua and Barbuda, other nations have legalized and regulated Internet Casino websites and Internet gambling including, but not limited to, New Guinea and Costa Rica.

legislative history of the UIGEA clearly shows that this inconsistency was known to its sponsors and criticized by its opponents. *See* comments drawn from *Congressional Record*, 109th Congress Debate on H.R. 4411, July 13, 2006 at Govtrac.com/H.R. 4411 [109th]: Internet Gambling Prohibition and Enforcement Act, *supra*. Therefore, the UIGEA must be declared unconstitutional under *Lawrence,* Plaintiff submits.

In fact, it is recognized by the Federal courts that the government's treatment of gambling is uneven, ambivalent and increasingly eroding. In ruling on the Wire Act's prohibition of gambling advertising, the Fifth Circuit noted that:

> The Federal government's policy toward legalized gambling is consciously ambivalent. What began as a prohibition on all interstate lottery advertising has been successively, but gingerly modified to respect varying state policies and the Federal government's encouragement of Indian commercial gambling. The remaining advertising limits reflect congressional recognition that gambling has historically been considered a vice; that it may be an addictive activity; that the consequences of compulsive gambling addiction affect children, the family, and society; and that organized crime is often involved in legalized gambling.

*Greater New Orleans Broadcasting Ass'n v. U.S.* 149 F.3d 334, 339 (5th Cir. 1998) (footnotes omitted). *Greater New Orleans,* straining to make sense of changing jurisprudence regarding the Federal regulation of gambling advertising and gambling itself, sustained the constitutionality of 18 *U.S.C.* §1304 only because it applied uniformly to all states, whether or not gambling was legal or illegal in any given state. *Id.* at 340. Here, the payment system instrument system is legal, and the UIGEA itself already carves out large exemptions for some forms of gambling. Significantly, the UIGEA does not address the lack of exceptions for Internet gambling which led the *In Re MasterCard Litigation* court to conclude that the use of payment system instruments was legal under Federal law for Internet gambling. In such circumstances, the United States Supreme Court has struck down state regulations concerning the advertising of alcoholic

beverage prices, not on interstate commerce grounds but on First Amendment grounds as shown above. *Rhode Island Liquor Stores Assn. v. Evening Call Pub. Co.,* 517 U.S. 484, 116 *S.Ct.* 1495 (2006).

In reviewing the broad exceptions to prohibition of gambling advertising under 18 *U.S.C.* §1304, the Ninth Circuit accepted as true the government's assertion that the limitation on advertising was in fact a potent way to limit any form of gambling, and that the government had a legitimate interest in limiting gambling. *Valley Broadcasting Co. v. U.S.,* 107 *F.3d* 1328 (9th Cir. 1997) Notwithstanding these two commercial speech considerations, however, the court observed that:

> we are troubled by the numerous exceptions to section 1304. Although criminalizing broadcast advertising by commercial lotteries, the regulatory scheme at issue here permits the following lotteries to advertise via the airwaves: state-run lotteries, fishing contests, not-for-profit lotteries, lotteries conducted as promotional activities by commercial organizations, and, perhaps most significantly, any gaming conducted by Indian Tribes pursuant to the Indian Gaming Regulatory Act. . . . . The question we thus must resolve is whether the existence of these myriad exceptions precludes section 1304 from directly advancing the government's purported interests.

*Id.* at 1334. The court struck the statute down, stating, "because section 1304 permits the advertising of commercial lotteries by not-for-profit organizations, governmental organizations and Indian Tribes, it is impossible for it materially to discourage public participation in commercial lotteries." *Id.* at 1335. The statute was unconstitutional under the First Amendment because, despite its avowed aim, its' purpose was permeated with exceptions which belied the statutory purpose.

As noted in Plaintiff's Statement of Facts, the WTO has declared the United States to be in violation of an international treaty for the same reasons; carve-outs for certain types of gambling, particularly horse racing, exist and are inconsistently applied.

40

07-209 U Part 1WT/DS285/RW *United States - Measures Affecting the Cross-border Supply of Gambling and Betting Services* - Recourse to Article 21.5 of the DSU by Antigua and Barbuda - Report of the Panel dated March 30, 2007, paragraphs 6.109 through 6.135. Thus, the inconsistency in the UIGEA compounds across international borders as well. Although the Uruguay Rounds (the WTO) are not binding and have no effect where any provision or decision is inconsistent with United States law under 19 *U.S.C.* §2504(a) and 19 *U.S.C.* § 3512(a), the case law cited above, in particular *In Re MasterCard Litigation* and *Valley Broadcasting* is <u>consistent</u> with the Appellate Panel Decision in the Antigua and Barbuda WTO litigation; our laws regarding Internet gambling and payment system instruments which transmit money for gambling are wildly inconsistent. Congress's authority extends to inconsistent measures. *See, e.g. Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 *F. 2d* 660 (Fed Cir. 1992). While a U.S. court need not enforce an inconsistent decision of the WTO, *Corus Staal BV v. Department of Commerce, et al.,* 395 *F.3d* 1343 (Fed. Cir. 2005), it has long been a principle of international law that a court should interpret statutes consistently with U.S. international treaty obligations. *Id.* at 1347-1348, citing *Murray v. Schooner Charming Betsy,* 6 *U.S.* (2 Cranch) 64, 2 *L.Ed.* 208 (1804). Further, where the U.S. is a party to a WTO Appellate Body determination, that decision should be given binding effect. *Slater Steels Corp, et al., v. United States, et al.,* 297 *F. Supp. 2d* 1351, 1358 (Ct. Int. Trade), *aff'd o.b.* 159 *Fed. Appx.* 1007 (Fed. Cir. 2004).

Plaintiff urges the court, in this case, to enjoin effectiveness and enforcement of the UIEGA because, even if the legislative comments and history sustain some regulation, they do not, and cannot, sustain elimination and criminalization under the

clear holdings of the cases above. Here, instead of advertising, the attempted mechanism of unconstitutional control of gambling by the Federal government is payment system instruments and the promotion of their use in Internet gambling. In the same way that 13 *U.S.C.* §1304 was shown by the cases to be swallowed up by its exceptions, the UIGEA carves out horseracing, lotteries, and any state-based regulation of gambling. Because these same carve-outs exist in the UIGEA, the court must, Plaintiff submits, declare the UIGEA unconstitutional.

## CONCLUSIONS

For all the foregoing reasons, Plaintiff submits that the UIGEA must be restrained and enjoined from enforcement. First, Plaintiff has standing to challenge the UIGEA because of its immediate, documented affect on entities and persons situated as iMEGA's members. iMEGA has satisfied the criteria for issuance of a temporary restraining order: (1) there is a substantial likelihood that iMEGA will prevail on the merits; (2) clearly, iMEGA's members and those whose interests are represented will suffer irreparable injury unless the injunction issues; (3) the threatened injury to First Amendment protected rights outweighs the lack of damage if the UIGEA is not restrained; and (4) the injunction, if issued, is not i adverse to the public interest.

Next, under *Lawrence, supra,* the act of gambling in private on the Internet is protected by First Amendment privacy concerns. Furthermore, filtering technology is recognized by the Supreme Court, led by the Third Circuit's integration of tradition and technology under *Ashcroft, supra,* in the COPA litigation and in the *Sable Communications* litigation, as a less restrictive means to regulate protected conduct. State laws in at least the states of Alabama, Alaska, Missouri and New Jersey do not

42